ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

JARED S. BUSZIN (NYBN 5285838)
ALEXANDRA SHEPARD (CABN 205143)
Assistant United States Attorneys

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (415) 436-7200
     FAX: (415) 436-7234
     Jared.Buszin@usdoj.gov
     Alexandra.Shepard@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. 23-CR-291 WHO |
|      Plaintiff, | ) UNITED STATES' SENTENCING<br>) MEMORANDUM |
|   v. | ) |
| LAMAR NOLAN RYAN, | ) Court:  Hon. William H. Orrick<br>) Hearing:  March 28, 2024 |
|      Defendant. | ) Time: 1:30 p.m. |

## **CONTENTS**

INTRODUCTION ........................................................................................................................ 1

RELEVANT BACKGROUND ................................................................................................... 2

I.  The Offense and Relevant Conduct .................................................................................. 2

II.  The Defendant's Post-Conviction Criminal Conduct Before Reporting to BOP in His
    First Federal Case ........................................................................................................... 8

III.  Evidence of the Defendant's Involvement in Other Criminal Activity While on
     Federal Supervised Release ........................................................................................... 10

       A.  Pimping and Pandering ....................................................................................... 10

       B.  Use of a Firearm to Commit Rape ...................................................................... 14

       C.  Trafficking of Controlled Substances ................................................................. 18

       D.  Suspected Identity Theft ..................................................................................... 19

       E.  Other Miscellaneous Suspected Criminal Conduct ............................................ 20

IV.  The Defendant's Criminal History ................................................................................. 20

V.  Procedural History .......................................................................................................... 21

SENTENCING GUIDELINES CALCULATION ...................................................................... 24

I.  Legal Background ............................................................................................................ 24

       A.  Identifying Relevant Conduct ............................................................................. 24

       B.  Use of Electronic Evidence to Establish the Offense Level Under U.S.S.G.
           § 2K2.1 ............................................................................................................... 25

       C.  Standard of Proof ................................................................................................ 26

II.  The Government's Guidelines Calculation ...................................................................... 27

       A.  The Offense Involved at Least Three Firearms, Including a Semiautomatic
           Firearm Capable of Accepting a Large Capacity Magazine .............................. 28

       B.  The Defendant Used/Possessed the Charged Firearm in Connection with
           Another Felony Offense ...................................................................................... 29

       C.  The Defendant Is Not Entitled to Credit for Acceptance of Responsibility ...... 31

SENTENCING RECOMMENDATION ..................................................................................... 33

I.  Legal Standard ................................................................................................................. 33

II.  Judiciary Sentencing Information (JSIN) ........................................................................ 34

III.  Application of Section 3553(a) Factors .......................................................................... 34

A.  Nature and Circumstances of the Offense ........................................................35

B.  History and Characteristics of the Defendant ...................................................35

C.  The Need for the Sentence to Afford Adequate Deterrence, Protect the Public from Future Crimes of the Defendant, and Promote Respect for the Law .......................37

D.  Need to Avoid Unwarranted Sentencing Disparities .........................................38

CONCLUSION................................................................................................................39

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

*United States v. Wright*, 993 F.3d 1054 (8th Cir. 2021) ........................................................ 25

4

*Galloway v. United States*, 2016 U.S. App. LEXIS 24280 (9th Cir. Sep.
    16, 2016) .......................................................................................................................... 34

5

6

*United States v. Booker*, 54 U.S. 220 (2005) ....................................................................... 26

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) ...................................................... 33, 34

7

*United States v. Charlesworth*, 5 F. App'x 612 (9th Cir. 2001) ............................................ 23

8

*United States v. Coleman*, 884 F.3d 67 (1st Cir. 2018) ........................................................ 33

9

*United States v. Davis*, 875 F.3d 869 (8th Cir. 2017) ........................................................... 33

10

*United States v. Fortune*, 2023 WL 6439886 (2d Cir. Oct. 3, 2023) .................................... 26

11

*United States v. Green*, 940 F.3d 1038 (9th Cir. 2019) ......................................................... 2

12

*United States v. Harrison*, 2020 WL 8921413 (6th Cir. Oct. 28, 2020) ............................... 26

13

*United States v. Innie*, 7 F.3d 840 (9th Cir. 1993) ............................................................... 31

14

*United States v. Lonich*, 23 F.4th 881 (9th Cir. 2022) ..................................................... 26, 27

15

*United States v. Lucas*, 70 F.4th 1218 (9th Cir.), *reh'g en banc granted,
    opinion vacated*, 77 F.4th 1275 (9th Cir. 2023) .............................................................. 26

16

*United States v. McKinney*, 15 F.3d 849 (9th Cir. 1994) ...................................................... 32

17

*United States v. Mohammed*, 89 F.4th 158 (D.C. Cir. 2023) ................................................ 26

18

*United States v. Parlor*, 2 F.4th 807 (9th Cir. 2021) ........................................................... 25

19

*United States v. Prieto*, 85 F.4th 445 (7th Cir. 2023) ........................................................... 26

20

*United States v. Sandidge*, 784 F.3d 1055 (7th Cir. 2015) ................................................... 33

21

*United States v. Slager*, 912 F.3d 224 (4th Cir. 2019) ......................................................... 23

22

*United States v. Spencer*, 685 F. App'x 863 (11th Cir. 2017) .............................................. 26

23

*United States v. Worthing*, No. 12-CR-300-CRB, 2018 WL 10322025
    (N.D. Cal. Mar. 2, 2018) .................................................................................................. 23

24

25

*United States v. Wright*, 993 F.3d 1054 (8th Cir. 2021) ....................................................... 25

26

*United States v. Zirpolo*, No. 21-CR-404 (N.D. Cal.), Dkt. 56 ............................................ 25

27

**UNITED STATES SENTENCING GUIDELINES**

28

U.S.S.G. § 1B1.3 Appl. Note 5(B) ................................................................................... 24, 25

U.S.S.G. § 1B1.3(a)(1)................................................................................................ 24, 33

U.S.S.G. § 1B1.3(a)(2)................................................................................................ 24, 33

U.S.S.G. § 2K2.1 Appl. Note 2.......................................................................................... 29

U.S.S.G. § 2K2.1(a)(4)(B)................................................................................................ 27

U.S.S.G. § 2K2.1(b)(1)(A)................................................................................................ 27

U.S.S.G. § 2K2.1(b)(4)...................................................................................................... 27

U.S.S.G. § 2K2.1(b)(6)(B)................................................................................................ 27

U.S.S.G. § 3D1.2(d)............................................................................................................ 24

U.S.S.G. § 3E1.1............................................................................................................ 28, 31

U.S.S.G. § 3E1.1 Appl. Note 1.......................................................................................... 31

U.S.S.G. § 3E1.1 Appl. Note 2.......................................................................................... 32

**RULES**

Fed. R. Crim. P. 16(a)(1)(G)(i).......................................................................................... 23

Fed. R. Evid. 1101(d)(3)...................................................................................................... 23

**INTRODUCTION**

Defendant Lamar Ryan has been found guilty of unlawfully possessing a loaded firearm as a convicted felon.  But this case is about much more than that.

For some, a first federal conviction is a wakeup call that prompts a change in one's life.  Mr. Ryan is not one of those individuals.  Instead, within ***days*** of pleading guilty to a federal bank fraud offense in January 2021, the defendant went right back to doing what the PSR shows he has been doing for virtually his whole life—committing crime and victimizing members of the community.  This course of criminal conduct ultimately culminated with the events giving rise to this case.

The defendant's criminal activity since his 2021 federal conviction has been wide-ranging.  It includes pimping and attempting to pimp multiple women, including a minor, over an extended period of time, which appears to have been extremely lucrative for the defendant.  It includes selling a variety of controlled substances, as the defendant's criminal history demonstrates he had been doing repeatedly over the preceding two decades.  It includes the unlawful possession of multiple firearms, including a particularly dangerous firearm equipped with a large-capacity magazine and one that was suspected of being modified to operate as a fully automatic machinegun.  It includes the use of a firearm to commit a rape late at night in a San Francisco hotel.

Many of these criminal acts share a common and troubling theme—the targeting and victimization of women whom the defendant recognized were in vulnerable positions.  Indeed, as the defendant himself acknowledged in a March 2023 text message:  "[M]en try women when they see they by themselves hustling."  Buszin Decl., Ex. 1 at LR-02907.  That is ***exactly*** what the defendant did on July 1, 2023, when he arranged to engage in sex acts with Victim AT, took back the money he paid her, pressured her to come work for him, and showed her his loaded firearm.

Even after he was arrested and charged with a federal crime for the second time in a few short years, the defendant has demonstrated no remorse or intention to change his ways.  Instead, after he hid his firearm in the patrol vehicle where he was detained, the defendant determined he could likely beat the charge and go back to the same lucrative criminal activity he had been engaged in for years.  To that end, he invoked his right to a speedy trial and sought to preclude the government from introducing material evidence at trial that was not produced or specifically identified by the government before a

discovery deadline, which was set for eleven days after his first district court appearance and more than six weeks before the originally scheduled trial date.  Only at the very last minute—upon learning that a highly inculpatory video discovered by the government a week before trial would not be excluded from trial—did the defendant shift strategy, waiving his right to a jury trial and representing to the Court that he would not contest factual guilt on the charged offense.  While this strategic move may have been designed to claim credit for acceptance of responsibility at the time of sentencing, the record makes plain that he has failed to do so.

This Court is now tasked with correctly calculating the defendant's recommended sentencing range under the Guidelines and then making a "holistic and individualized determination" as to the appropriate sentence under the Guidelines and the factors set forth in 18 U.S.C. § 3553(a).  *United States v. Green*, 940 F.3d 1038, 1043 (9th Cir. 2019).  In accordance with that mandate, and for the reasons set forth below, the government respectfully recommends that the Court (i) find the defendant's Guidelines range to be 168 – 210 months' imprisonment based on a Total Offense Level of 30 and Criminal History Category VI, and (ii) sentence the defendant to a 156-month term of imprisonment, to be followed by a three-year term of supervised release.

## RELEVANT BACKGROUND

### I.   The Offense and Relevant Conduct

On July 1, 2023, the defendant arranged for a date with a sex worker ("Victim" or "AT") at the San Francisco motel where she was staying.  Buszin Decl., Ex. 1 at LR-00898 – 908 (text chain between defendant and AT).  The Victim engaged in sex acts with the defendant for an agreed price of $500, which the defendant paid in cash.  *Id.* at LR-00899; Buszin Decl., Ex. 2 at LR-00236 (incident report).  However, after engaging in intercourse with the Victim, the defendant walked over to where he had placed the money in her room and took it back.  Buszin Decl., Ex. 2 at LR-00236.  The defendant then told the Victim he was pimping several women in the San Francisco area and tried to convince her to work for him as well.  *Id.*  He told the Victim she could make several thousand dollars a day working for him, from which he would take a 30% cut.  *Id.* at LR-00237.  The defendant told the Victim she should pack her belongings and come with him to South San Francisco ("South City"), where they would rent a hotel room and start posting ads soliciting customers for in-call dates at the hotel.  *Id.*  At the time, the

Victim worked as an independent sex worker and she did not want to work for a pimp.  *Id.* at LR-00236.

Nevertheless, because of the defendant's persistence and the vulnerable situation in which she found

herself, the Victim felt she had no alternative option and reluctantly agreed to go with the defendant.  *Id.*

at LR-00229.

The Victim notified members of her family about what was going on, telling them in a group

chat that a man was trying to "convince" her but that she did not want to involve law enforcement.[1]

Buszin Decl., Ex. 3 at LR-03542.  The defendant took the Victim from San Francisco to a Comfort Inn

in South City, where he rented a room for $206.84.  Buszin Decl., Ex. 2 at LR-00237; Buszin Decl., Ex.

4 at LR-00208 – 210 (receipt from Comfort Inn).  The defendant paid for the room in cash.  Buszin

Decl., Ex. 4 at LR-00210.  After checking into the room, the Victim told the defendant she needed to do

laundry, so he took her to a laundromat in South City.  Buszin Decl., Ex. 2 at LR-00237.  At some point

before their arrival at the laundromat, the defendant showed the Victim a Glock firearm that he had with

him and told her she would be "protected" working for him and that she would not be working for a

"punk."  *Id.* at LR-00237 – 238.  Although the defendant did not expressly threaten the Victim with his

firearm, she became even more frightened and intimidated when she learned that the defendant was

armed.  *Id.*

The Victim alerted her family that the man she was with had a firearm, leading them to become

increasingly fearful for her safety.  Buszin Decl., Ex. 3; Buszin Decl., Ex. 5.

---

[1] Her messages, sent to family in a private group chat as events unfolded, provide valuable insight into the facts and the Victim's concerns.

1
2
3
4
5
6
7
8
9
10
11
12
13



14  Although the Victim indicated to her family that she did not want to involve law enforcement because

15  she was afraid she would be arrested for prostitution, they called 911 anyway.  Buszin Decl., Ex. 5;

16  Buszin Decl., Ex. 2 at LR-00246 – 248.  As a result, South City Police Sgt. Daniel Brown contacted the

17  Victim's sister-in-law, AG, who told Sgt. Brown that the Victim had been taken by an armed man who

18  was going to make her sell herself.  Buszin Decl., Ex. 2 at LR-00247.  AG also told Sgt. Brown that the

19  defendant had told the Victim to not make him use force around the time he showed her his gun.[2]  *Id.*

20  AG was able to track the Victim's location based on her cell phone, and she told Sgt. Brown that the

21  Victim was in a car with the then-unidentified man at a laundromat on Linden Avenue in South City.  *Id.*

22        Sgt. Brown and other South City officers responded to the laundromat, where they began

23  searching for the Victim.  *Id.* at LR-00248 – 249.  After noticing a gray Audi sedan that was running,

24  Sgt. Brown and South City Officer Angelo Bortolin opened the vehicle's front doors and located the

25

26  _____

27  [2] This information accurately reflected what the Victim had said in the text chain with her family
   at the time.  Buszin Decl., Ex. 5 at LR-05727 ("he said I dont even want to even have to use force on you just
   come on").  As the Victim later clarified to the police, the defendant did not expressly threaten her with

28  his gun or otherwise use force on her; however, she went with the defendant reluctantly based on the
   coercive situation in which she found herself.  Buszin Decl., Ex. 2 at LR-00229, 237 – 238.

Victim and the defendant.  Buszin Decl., Ex. 6 (Sgt. Brown BWC).  South City officers directed the defendant to get out of his car, at which point he was handcuffed and frisked for weapons.  Buszin Decl., Ex. 7 (Ofc. Bortolin BWC).  No weapons were found during that frisk and the defendant was placed in Officer Bortolin's patrol vehicle, where he was left unattended for several minutes.  Buszin Decl., Ex. 8 (video of patrol vehicle interior).  During that time, the defendant was able to dislodge his undiscovered Glock firearm from the bellyband gun holster he was wearing around his midsection, after which he attempted to conceal the firearm under the patrol vehicle seat in front of him.  *Id.*

At the laundromat, officers searched the defendant's vehicle for the reported firearm.  Buszin Decl., Ex. 2 at LR-00240 – 243.  Although they did not find the firearm in the defendant's car, they did find suspected MDMA (ecstasy), cocaine, Xanax, Adderall, and marijuana in plastic packaging along with a digital scale.[3]  *Id.* at LR-00223, 230 – 231, 241 – 242.  They also found the defendant's cell phone and $341 in cash during their search of the defendant and his car.  *Id.* at LR-00223.  Later that day, back at the South City Police Station, officers discovered the defendant's loaded firearm partially concealed and wedged tightly under the front right seat of the patrol vehicle used to transport him.  *Id.* at LR-00227 – 228.

After the defendant's arrest and federal indictment for unlawfully possessing a firearm as a convicted felon, the FBI reviewed three cell phones belonging to the defendant—two phones that had been seized by the U.S. Marshal Service ("USMS") on August 8, 2022[4] and the cell phone that was seized by South City officers on July 1, 2023 (the "South City phone").  On the South City phone, the FBI located a video taken by the defendant in June 2023 which showed him sitting in his car next to the firearm recovered by South City officers on July 1, 2023.  Dkt. 70 at 43:1-48:19.

The FBI also located other videos on the South City phone showing the defendant possessing various firearms.  *Id.* at 127:21-129:2.  One video, which metadata indicated was created on May 29,

---

[3] Although the Victim had her own marijuana in her bag, she reported to officers that the suspected controlled substances found in the defendant's car did not belong to her.  Buszin Decl., Ex. 9 (Ofc. Wong BWC).  She also told officers during a later interview that the defendant had made a stop to sell certain controlled substances before he brought her to the Comfort Inn in South City.  Buszin Decl., Ex. 10 at 6:23 – 6:57 (Sgt. Brown BWC).

[4] *See United States v. Lamar Ryan*, No. 22-CR-87, Dkt. 9 (Probation request to search cell phones).

2023,[5] showed the defendant carrying a firearm with an extended magazine in the bellyband holster he had been wearing when he was arrested in South City on July 1, 2023.  *Id.* at 129:3-133:1; Buszin Decl., Ex. 11 (video of defendant).  The firearm in the defendant's holster was equipped with a toggle switch at the back of the slide, which is a component of a conversion device used to render an otherwise semi-automatic Glock firearm into a fully automatic machinegun.  Dkt. 70 at 195:18-203:6.



Another video from the South City phone, which metadata indicated was created no later than September 23, 2022, showed the defendant holding a privately made firearm ("ghost gun") equipped with a drum magazine in his hand, with another ghost gun and a loaded extended magazine on a bed

---

[5] During the video, the defendant makes a remark about it being Memorial Day, which fell on May 29 in 2023.  Buszin Decl., Ex. 11.

right in front of the defendant.[6]  Dkt. 70 at 133:5-133:24, 150:6-151:4, 204:1-207:7; Buszin Decl., Exs. 12 (video) and 13 (screenshot from video with metadata).  The drum magazine attached to the firearm in the defendant's hand appeared to be capable of holding at least 25 rounds of ammunition.  Dkt. 70 at 208:25-209:20.



The seized cell phones contained additional content related to firearms.  For example, the South City phone contained a text chain between the defendant and another person, which included a June 25,

---

[6] Although the defendant's face is not shown in the video, the hand holding the firearm has tattoos matching the defendant's distinct tattoos and the bedspread on the bed shown in the video matched a bedspread located in the defendant's residence.  Dkt. 70 at 134:8-138:3.

2023 text message from the defendant where he wrote "Bitch come bring me my gun."  Buszin Decl., Ex. 14 at 429.  And approximately ten months before then, in an August 2, 2022 text message located on one of the phones seized by the USMS, the defendant alluded to his contemporaneous possession of firearms, writing "[m]ines is better then that that's a ghost gun and they known for jamming."  Buszin Decl., Ex. 15 at LR-03259.  That same phone also contained pictures taken of firearms other than the ones discussed in the preceding paragraphs, although the defendant was not visible or otherwise identifiable in the images.[7]  *Id.* at LR-03540 – 3541 (tagged images #1 and #4).

Federal law enforcement also conducted a search of the defendant's residence in November 2023, resulting in the discovery of two Glock firearm magazines hidden in the corner of a closet in the defendant's bedroom.  Dkt. 70 at 146:21-149:4.  The two magazines were for .40-caliber ammunition.  *Id.* at 146:21-149:4.  By contrast, the Glock the defendant possessed on July 1, 2023 was a .45-caliber firearm.  *Id.* at 146:21-149:4, 194:18-20.  Forty-caliber ammunition cannot be used in a .45-caliber firearm.  *Id.* at 148:23-149:11.

## II.     The Defendant's Post-Conviction Criminal Conduct Before Reporting to BOP in His First Federal Case

The offense giving rise to this case occurred while the defendant was on supervised release in connection with his 2021 federal conviction for bank fraud.  That first federal case commenced on December 11, 2019 when an indictment was returned by a grand jury in the Central District of California charging the defendant with nine counts of bank fraud and one count of aggravated identity theft.  *United States v. Lamar Nolan Ryan, et al.*, No. 19-CR-756-JAK (C.D. Cal.) (hereinafter "*Lamar Ryan I*"), Dkt. 1.  The defendant had his initial appearance in February 2020 and was ordered detained.  *Lamar Ryan I*, Dkt. 12, 14.  In May 2020, as the COVID-19 pandemic spread, the defendant was released on bond and ordered to live at his uncle's residence in San Francisco,[8] subject to location monitoring.  *Lamar Ryan I*, Dkt. 25, 27.  On December 28, 2020, the defendant's bond was modified to

---

[7] The metadata for one of those photos—which depicted a black firearm in a case—indicated that the file was created/modified/accessed at 11:16 AM UTC on August 3, 2022, which was the same general timeframe when the defendant was texting about his firearm on August 2, 2022.  Buszin Decl., Ex. 15 at LR-03541.

[8] This is the same relative with whom the defendant was residing at the time he committed the offense charged in this case.

remove the location monitoring condition. *Lamar Ryan I*, Dkt. 91. Approximately two weeks later, on January 14, 2021, the defendant pleaded guilty to one count of bank fraud pursuant to a plea agreement. *Lamar Ryan I*, Dkt. 97. The case was set for sentencing in Summer 2021. *Id.*; *Lamar Ryan I*, Dkt. 129.

Less than a month after being taken off location monitoring and less than a week after his change of plea, the defendant was arrested on a pandering charge in the Mission neighborhood of San Francisco after he attempted to recruit a 17-year-old female to work for him as a sex worker. Buszin Decl., Ex. 16. The minor victim reported that the defendant had repeatedly tried to recruit her to work for him, yelling at her things like "Bitch, I'm the best thing out here" and "Tap in when you ready for a real pimp!" *Id.* at LR-03058 – 3060, 3062. The defendant was charged with state felony pandering offenses in connection with this incident, though the case was resolved with the defendant pleading guilty only to misdemeanor offenses and receiving a sentence of time served and one year of probation. Buszin Decl., Ex. 17.

On July 8, 2021, the defendant was sentenced to an 18-month term of imprisonment for his federal conviction and was ordered to surrender on October 26, 2021 to serve his sentence. *Lamar Ryan I*, Dkt. 129; Buszin Decl., Ex. 37 (sentencing hearing transcript). Before that surrender date, however, the sentencing court scheduled an order to show cause hearing to address evidence that the defendant had repeatedly violated his conditions of release and engaged in further new criminal conduct. *Lamar Ryan I*, Dkt. 137. In particular, beyond the January 2021 pandering offense described above, the FBI had received a tip in August 2021 regarding the defendant's use of Instagram to sell firearms and controlled substances. The tip also indicated that the defendant was involved in public benefits fraud ("EDD fraud"). The tip's allegation regarding firearm and drug trafficking was corroborated by a review of the defendant's Instagram page at the time.[9] Buszin Decl., Ex. 38.[10] The following images are screen clips from Instagram stories posted by "3rdworldmar34," the defendant's Instagram account:

---

[9] The Instagram account has since been made private.

[10] The prosecution team in this case learned of the tip and corroborating Instagram posts on March 20, 2024, the day before the instant memorandum was due to be filed.



The order to show cause hearing went forward on September 2, 2021. *Lamar Ryan I*, Dkt. 140. At the hearing, the defendant agreed to self-surrender that day. *Id.* He was released from BOP custody approximately two months later—on November 10, 2021—after receiving credit for prior time served, and his term of supervised release commenced.

## III.   Evidence of the Defendant's Involvement in Other Criminal Activity While on Federal Supervised Release

In the course of its investigation and trial preparation, the government discovered evidence demonstrating the defendant's involvement in a wide range of other criminal conduct since his release from federal prison in November 2021, as described further below.

### A.   Pimping and Pandering

During her review of the South City phone, FBI Special Agent Martha Parker identified text messages between the defendant and multiple individuals whom the defendant appeared to be pimping. Dkt. 70 at 139:17-144:14. In these text chains, the defendant and the other individuals would communicate about posting ads, "dates" that the sex workers were having with customers, the amount of

money the sex workers had received from those dates and the defendant's share of the proceeds, and securing hotel rooms where the sex workers could meet with clients. *Id.* at 139:17-144:14. There were also text chains reflecting the defendant's attempts to recruit women to work for him as sex workers. *Id.* at 144:7-9.

For example, on June 30, 2023, the defendant sent the message "[s]end daddy some pictures and I will post u" to a phone number corresponding to a 21-year-old female, who then sent the defendant numerous pictures of herself in seductive poses and various stages of undress.[11]  Buszin Decl., Ex. 14 at 100-108.  The defendant asked the female which picture she wanted him to post, but she replied "[y]ou pick daddy." *Id.*  At approximately 3:30 a.m. that morning, the female texted the defendant to let him know she had "two dates" at her room but was not sure how to get back there. *Id.* at 114-130.  In the minutes that followed, the defendant asked the female if she was going back to her room and said that "[she] better" do so. *Id.*  Later that morning, the defendant told the female she should go back to her room "[a]nd post" before assisting her with getting an Uber. *Id.*

Another text chain between the defendant and a 30-year-old woman included numerous communications regarding commercial sex.  For example, on June 15, 2023, the woman texted the defendant "Got 200 out this trick and playing so we shall see" and he replied "ok."[12]  *Id.* at 292-293.  On June 17, 2023, the woman texted the defendant that she had an outcall (an offsite "date") and let him know when she was arriving at the client's location. *Id.* at 306-308.  She continued to provide the defendant with updates on her various "dates" in the days that followed, including on June 18, June 19, June 22, June 23, June 24, June 25,[13] and June 30. *Id.* at 323-334, 379-382, 384-416, 422-427, 479-483.  On June 25, the female told the defendant she could only pay him $300 plus some of the money she had made that night, after which the defendant sent a series of aggressive messages demanding that the female bring him certain of his belongings. *Id.* at 428-440 ("Bitch come bring me my gun") ("Bitch I'm

---

[11] As Special Agent Parker testified at the December 4, 2023 evidentiary hearing, it is common for pimps to have women they are trafficking refer to them as "daddy."  Dkt. 70 at 141:22-25.

[12] The terms "trick" or "john" are frequently used to refer to clients who pay sex workers for their services.  Dkt. 70 at 140:19-21.

[13] When the female notified the defendant that she and another woman had stolen cash from their client's pockets before he left on June 25, the defendant responded "ok cool."  Buszin Decl., Ex. 14 at 479-483.

not go play these games with u") ("Bitch if you don't want your car biped and all your tires on flats you will bring my shit").[14]

The defendant's phone also contained messages in which the defendant acknowledged and bragged about his work as a pimp.  For example, in a March 16, 2023 text exchange, a female messaged the defendant that people had told her "your [sic] a pimp and you be tryna groom bitches."  Buszin Decl., Ex. 1 at LR-02886 – 2887.  The defendant responded, "No them bitches be already in the game" before stating further "[t]hem bitches be already getting down they just choose me bc they know I know what to do with the money."[15]  *Id.*  On July 21, 2022, when the mother of the defendant's daughter referenced the defendant staying at hotels and traveling out of town with his "work," the defendant responded "I need to watch my money" and added "Hoes be tucking," implying he was concerned the women he was trafficking would not pay him a cut of their earnings if he did not keep tabs on them. Buszin Decl., Ex. 15 at LR-03082 – 3084.  Indeed, the defendant's pimping operation was highly lucrative for him and he made a point of signaling that to others on his social media account:

---

[14] "Bipping" is a slang term used to refer to vehicle burglaries.

[15] In a June 28, 2023 text chain, the defendant replied "yep" to a 20-year-old female's question "u be pimping?" during a conversation in which the defendant advised the female on how to make money selling explicit content online.  Buszin Decl., Ex. 14 at 205-213.

 

The defendant's phones also contained messages demonstrating the defendant's attempts to recruit sex workers to work for him, just as he did with AT on July 1, 2023. For example, on June 19, 2023, the defendant responded to an ad posted by a sex worker who told the defendant she was 18 years old. Buszin Decl., Ex. 14 at 216-235. After the woman told the defendant what hotel she was staying at, the defendant sought to convince her that she would be better off working for him, telling her "come fuck with a real one so I can upgrade you," "[f]uck that dirt bag as hotel you better then [sic] that," and "You need better pictures you tripping tell your bf to invest in a bitch." *Id.* at 218-221. The defendant then texted the female, "I got a PD account you can use but you will have to take some new pictures so you can pop," after which he added "We can help each other I'm down." *Id.* at 222-223. The defendant continued to send the female messages in the days that followed, including the very morning that he attempted to recruit AT to work for him. *Id.* at 227-235.

The defendant's attempts to recruit sex workers to work for him were not limited to adults, as the January 2021 pandering incident involving a 17-year-old victim (discussed above) demonstrates.

### B.     Use of a Firearm to Commit Rape

On May 31, 2022, Victim MM was visiting San Francisco from Las Vegas when she went out for the night by herself.[16]  Buszin Decl., Ex. 19 at LR-00370 – 371.  She had several drinks at a hotel bar before going to a karaoke bar at the border of Union Square and the Tenderloin.  *Id.* at LR-00371.  She met the defendant for the first time in the vicinity of the karaoke bar, and the two agreed to go get food. *Id.*  The defendant and MM brought the food back to MM's hotel room at which point they left to go to a strip club.  *Id.*  After spending time at the strip club, where they shared a drink, the defendant drove MM back to her hotel in his Maserati.  *Id.* at LR-00371 – 372.  MM told police that when she entered the hotel, she noticed the defendant had followed her to the elevator.  *Id.* at LR-00371.  Inside the elevator, the defendant began asking for the food he had left in MM's room, but she refused.  *Id.*  The defendant became verbally aggressive and came to MM's room; however, she told him to wait outside. *Id.*  MM attempted to close the door upon entering, but the defendant pushed it open and came inside. *Id.*

Inside the room, the defendant took out a small semi-automatic pistol, pointed it at MM, and told her to take off her clothes.  *Id.*  Fearing for her life, MM complied.  *Id.*  The defendant then pushed MM onto the bed and got on top of her, after which he vaginally penetrated her with his penis.  *Id.*  MM made several attempts to get up, but the defendant struck her in the head multiple times, grabbed her by the neck, and pulled her hair to prevent her from getting away.  *Id.*; Buszin Decl., Ex. 18 at 30:35 – 31:45, 59:40 – 1:00:35.  The defendant also forced MM to perform oral sex on him during this incident. Buszin Decl., Ex. 19 at LR-00371.  At one point, MM opened the door to her room, but the defendant forced it closed and vaginally penetrated her again.  *Id.*  Eventually, the defendant stopped the assault, got dressed, and left.  *Id.*  Before leaving, he told MM that he would tell security she was a prostitute and had tried to rob him, in an apparent attempt to dissuade her from reporting the assault.  Buszin

---

[16] An approximately 70-minute recorded law enforcement interview of Victim MM conducted at San Francisco General Hospital a few hours after the incident in question has been provided to the Court as Exhibit 18 to the March 21, 2024 Declaration of Jared Buszin.

1 Decl., Ex. 18 at 1:03:15.  MM reported that after the incident, the defendant's Instagram account (User

2 "3rdworldmar34") began following her account.  Buszin Decl., Ex. 19 at LR-00372.  She also reported

3 that the defendant had taken her purse from the floor of her hotel room before leaving and, soon

4 thereafter, she received a fraud alert for an unauthorized $500 charge on her credit card.  Buszin Decl.,

5 Ex. 18 at 31:45 – 34:20.

6 　　　First responders were contacted after this incident and MM was taken to the hospital, where a

7 sexual assault test was performed.  Buszin Decl., Ex. 19 at LR-00370, 372.  Photos of MM were also

8 taken at the hospital, including a photo showing the back of her scalp where the defendant had pulled

9 out her hair.  Buszin Decl., Ex. 20.  At the hotel, police interviewed Witness CH, who was staying in the

10 room adjacent to MM's room.  Buszin Decl., Ex. 19 at LR-00373.  CH reported that she had woken up

11 on her own at approximately 1:40 am and sometime later heard a female voice next door saying "I don't

12 have nothing for you" and "I don't know what you want."  *Id.*  CH then heard a scuffle in the room, after

13 which she heard the female voice say "ok, ok, ok."  *Id.*  The room then got quiet, but CH stated that she

14 subsequently heard the female's voice in distress, though she could not make out what was being said.

15 *Id.*  CH then heard three slapping sounds and the female voice stating, "why are you slapping me, help

16 me, help me, no no I'll be quiet."  *Id.*  CH told officers that she then heard a male voice say, "I'm putting

17 my clothes on I'm going to leave."  *Id.*  CH then heard the female voice yell, "Somebody help me!

18 There's a gun!"  *Id.*  CH heard the male voice say, "There is no gun."  *Id.*  After, CH heard the male

19 voice direct the female to put her clothes on as he was going to leave.  *Id.*

20 　　　　Police also reviewed hotel surveillance footage showing the defendant with MM.  *Id.* at LR-

21 00370.  The video showed the defendant and MM arriving at the hotel at approximately 12:25 a.m.,

22 going up to the 20th floor, and coming down and exiting the hotel at approximately 12:36 am.  *Id.* at LR-

23 00369, 372-373.  While they were in the elevator, surveillance video showed the defendant attempt to

24 kiss MM but she turned away and put her hand up to push him off.  Buszin Decl., Ex. 21 (surveillance

25 video).

26

27

28

1
2
3
4
5
6
7
8
9
10
11



12
13  At about 2:07 a.m., surveillance captured MM return to the hotel by herself with the defendant following

14  behind.  Buszin Decl., Ex. 22 (surveillance video).  MM then got into an elevator and the defendant

15  entered shortly thereafter.  Buszin Decl., Ex. 23 (surveillance video).  The elevator went to the 19th floor

16  and stopped, but nobody entered or exited the elevator.  *Id.*  The elevator then went to the 20th floor and

17  MM got off by herself.  *Id.*  After waiting a few seconds, the defendant got out of the elevator after MM

18  began walking away.  *Id.*  He watched her for several more seconds before walking down the hallway in

19  her direction.  *Id.*

20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11



12

13   Approximately 20 to 30 minutes later, the video showed the defendant getting into an elevator by

14   himself.  Buszin Decl., Ex. 24.  He was now wearing the hood of his sweatshirt over his head and

15   appeared to have an unknown item in his hand, which he concealed inside his sweatshirt.  *Id.*

16

17

18

19

20

21   

22

23

24

25

26

27

28   At about 3:06 a.m. (twenty minutes after surveillance video showed the defendant leaving the hotel),

first responders arrived to take MM to the hospital.  Buszin Decl., Ex. 25 at LR-00382.

In the course of investigating this incident, local police in Nevada did a photo lineup with MM, during which she identified the defendant as the person who had attacked her.  *Id.* at LR-00389.  SFPD also obtained a DNA sample from the defendant in March 2023, *id.* at LR-00392 – 393.  An analysis of the defendant's DNA and the sexual assault test performed on MM indicated that the defendant's DNA was present on MM's genitalia and breast, among other places.  *Id.* at LR-00394 – 95; Buszin Decl., Ex. 26 (DNA report).

After speaking with SFPD in January 2023 and receiving a list of follow-up investigative steps, MM stopped responding to SFPD outreach and the investigation was closed without charges.  Buszin Decl., Ex. 25 at LR-00390 – 395.

### C.  Trafficking of Controlled Substances

As noted above, South City officers found various controlled substances along with indicia of distribution in the defendant's car when it was searched on July 1, 2023.  *See* Relevant Background Part I, *supra*.  And AT informed South City officers during her post-incident interview that, before bringing her to the Comfort Inn, the defendant had stopped to sell controlled substances.  Buszin Decl., Ex. 10 at 6:23 – 6:57.  Additional evidence of the defendant's trafficking of controlled substances was found on his seized cell phones.

By way of example, the phone seized by South City police contained numerous text message chains where the defendant told various acquaintances that he was out "trapping," which is a slang term used to refer to drug dealing.  Buszin Decl., Ex. 27 at 17:10 – 17:50.  This included messages sent in 2023 by the defendant on February 4, February 13, March 8, March 16, May 8, June 4, and June 30.  Buszin Decl., Ex. 1 at LR-02823 – 2824, 2849, 3046; Buszin Decl., Ex. 28 at 627, 950, 1737, 4229 – 4230.  Even more explicitly, the defendant texted a woman at 2:00 a.m. on June 10, 2023, "Hey [where you at] I got the coke."  When the woman replied, "[we're] on our way home to novato," the defendant responded, "I'll bring it to u."  Buszin Decl., Ex. 28 at 1706 – 1708.  The defendant's text messages with the women he was trafficking also contained references to the defendant selling controlled substances.  Buszin Decl., Ex. 14 at 440 (Sex worker to Ryan: "Ru gonna let me buy some soft n xans off u or are u gonna be weird").

The defendant's involvement in trafficking controlled substances was further corroborated by the November 2023 search that federal agents performed at his residence, where they found indicia of drug trafficking including loose pills wrapped in plastic and an electronic scale.  Buszin Decl., Ex. 29.  It is also corroborated by the content on the defendant's Instagram account, which was identified by FBI in August 2021, as discussed above.

### D.   Suspected Identity Theft

As set forth in the PSR and further discussed below, the defendant has multiple prior felony convictions for offenses involving the misuse of victims' identifying information.  Evidence uncovered by federal agents during their November 2023 search of the defendant's residence suggests that the defendant has continued to engage in this conduct while on supervised release.

Among the defendant's belongings, agents found a suitcase containing mail, handwritten notes, identification documents, and other printed material which contained identifying information for 22 people.  Buszin Decl., Ex. 30 (FBI report).  Among these items was a Chinese passport and student ID card for Victim YL, which were reported stolen along with a laptop and other items in connection with a January 8, 2017 automobile burglary that took place in the Inner Richmond neighborhood of San Francisco.  *Id.*; Buszin Decl., Ex. 31 (incident report).  The suitcase at the defendant's residence also contained a birth certificate, social security card, and benefits card for Victim KP, who had previously filed a report with the Oakland Police Department regarding theft of funds from her EBT card.  Buszin Decl., Ex. 30 at LR-05793.  When interviewed by the FBI, KP said that nobody else should have her identification documents and she could not recall ever meeting the defendant.  Buszin Decl., Ex. 32.  Agents also found a photocopy of an identification card for Victim NK, as well as mail related to government benefits.  Buszin Decl., Ex. 30 at LR-05792.  NK reported experiencing periods of homelessness and acknowledged that someone could have taken her driver's license and made an unauthorized copy during that time.  Buszin Decl., Ex. 33.  She told the FBI she believed her identity had been used without her authorization, noting that she has received mail and notices regarding benefits and other services she never signed up for.  *Id.*

Finally, agents found a photocopied identification card for Victim LRE among the defendant's belongings at his residence.  Buszin Decl., Ex. 30 at LR-05793.  During an interview, LRE disclosed to

1   the FBI that the defendant was her son.  Buszin Decl., Ex. 34.  She said she never gave the defendant

2   permission to make a copy or otherwise possess her ID card.  *Id.*  She also reported there were numerous

3   occasions over the years where her identity appeared to have been used without her authorization.  *Id.*

4   For example, she recalled an apartment and house being rented in her name, and a PayPal account being

5   opened in her name as well.  *Id.*  She reported that there had been other accounts opened in her name

6   without her knowledge or authorization, though she could not recall the specific accounts or time when

7   the incidents occurred.  *Id.*

8           **E.      Other Miscellaneous Suspected Criminal Conduct**

9           The defendant's phones contained additional evidence regarding the defendant's involvement in

10  other suspected criminal activity.  By way of example, on the imaged copy of one of the defendant's cell

11  phones that was seized by the USMS, the FBI found an image of child sexual abuse material involving

12  two pre-pubescent nude females, along with two other image files that depicted sexually explicit

13  conduct involving nude females who were age-ambiguous.  Buszin Decl., Ex. 35.  And in a series of

14  March 23, 2023 text messages, the defendant wrote about having acquired a laptop that was not "clean,"

15  suggesting it was stolen property.  Buszin Decl., Ex. 1 at LR-01629 – 1630.

16  **IV.     The Defendant's Criminal History**

17          Since 2002, the defendant has accrued a wide array of criminal convictions as an adult in both

18  California and Georgia.  These include:

19      • Multiple felony convictions on state charges related to identity theft and financial fraud, and
         a federal felony conviction for bank fraud which entailed a loss amount of about $74,000
20       across 137 victims personally attributable to the defendant.  PSR ¶¶ 41, 42, 44.

21      • Multiple felony convictions in California on state charges related to trafficking of controlled
         substances.  PSR ¶¶ 37, 38, 39.
22
        • A felony conviction in California for a hit and run involving death or injury, as well as a
23        misdemeanor conviction for making a false report to a police officer.  PSR ¶ 40.

24      • A misdemeanor conviction in San Francisco involving the theft of property from a vehicle.
         PSR ¶ 43.
25
    The defendant also been arrested as an adult on at least 14 other known occasions identified in the PSR,
26
    including for identity theft/fraud, burglary, robbery, battery, domestic violence, and drug trafficking
27
    offenses.  PSR ¶¶ 49-53, 58-66.
28

1    **V.    Procedural History**

2         On March 3, 2022, the defendant's supervised release was transferred from the Central District

3    of California to this district.  *United States v. Lamar Ryan*, No. 22-CR-87 (N.D. Cal.), Dkt. 1.  In the

4    sixteen months that followed, the defendant accrued a number of alleged violations that remain pending.

5    *United States v. Lamar Ryan*, No. 22-CR-87 (N.D. Cal.), Dkt. 24.  In July 2023, Probation's Form 12

6    was amended to allege a new violation concerning the July 1, 2023 incident.  *United States v. Lamar*

7    *Ryan*, No. 22-CR-87 (N.D. Cal.), Dkt. 24.  On August 29, 2023, a federal grand jury returned a one-

8    count indictment charging the defendant with a violation of 18 U.S.C. § 922(g)(1) related to that same

9    incident.  Dkt. 1.  The defendant's initial appearance on the new indictment and alleged violation of

10   supervised release occurred on September 13, 2023.  Dkt. 3; *United States v. Lamar Ryan*, No. 22-CR-

11   87 (N.D. Cal.), Dkt. 27.

12        On September 21, 2023, the parties had their first appearance before the Court regarding the July

13   1, 2023 incident.[17]  *United States v. Lamar Ryan*, No. 22-CR-87 (N.D. Cal.), Dkt. 32.  At that hearing,

14   the defendant requested a speedy trial, which was then scheduled for November 13, 2023.  *United States*

15   *v. Lamar Ryan*, No. 22-CR-87 (N.D. Cal.), Dkt. 36 (Tr. at 3:1-4:3).  The Court inquired whether the

16   defense would be filing any motions in anticipation of trial, and the defense indicated there would be

17   "some" but "not an overwhelming amount."  *United States v. Lamar Ryan*, No. 22-CR-87 (N.D. Cal.),

18   Dkt. 36 (Tr. at 4:4-8).  The defense then requested that the Court set an October 2, 2023 cutoff date for

19   the production of discovery and disclosures, which was eleven days after this first district court

20   appearance.  *United States v. Lamar Ryan*, No. 22-CR-87 (N.D. Cal.), Dkt. 36 (Tr. at 4:21-5:25).

21   Pursuant to that request, the Court set an October 2 deadline for discovery and scheduled a pretrial

22   conference for October 30, 2023.  *United States v. Lamar Ryan*, No. 22-CR-87 (N.D. Cal.), Dkt. 32.

23        One week after the first district court status, the defendant filed a motion to suppress the firearm

24   he was charged with possessing along with other evidence.  Dkt. 9.  One week after that, the defendant

25   filed two separate motions to dismiss the indictment.  Dkt. 15, 16.  Eleven days later, the parties filed

26

27   _____

28        [17] The day before, the parties had an appearance before the Hon. Vince Chhabria, who was
     originally assigned to the newly charged case.  Dkt. 5.  After that hearing, the case was reassigned to the
     Hon. William H. Orrick, who was presiding over the defendant's supervised release case.  Dkt. 6, 7.

their pretrial motions *in limine*. Dkt. 23, 24. The defense filed ten such motions. Dkt. 23. As a general matter, those motions alleged that the government had failed to comply with the October 2 discovery deadline and argued that the government should therefore be precluded from calling myriad witnesses to testify at trial, including (i) the Victim, (ii) all the South City officers materially involved in the investigation, and (iii) the government's interstate nexus expert. Dkt. 23 at 1-6, 11-14. The defense also argued the government should be compelled to specifically identify "well in advance of trial" any statements of the defendant that might be introduced at trial. Dkt. 23 at 21.

On October 26, 2023, the Court issued an order denying the defendant's motion to suppress and motions to dismiss after hearing argument the week before. Dkt. 26, 37. At the October 30, 2023, pretrial conference, the Court rejected the defendant's request that evidence be excluded on the ground it was untimely disclosed. Dkt. 40.

On November 5, 2023, the government identified videos on the South City phone showing the defendant seated next to the firearm he was charged with possessing and showing him using his bellyband gun holster to carry a firearm. Dkt. 46. At 1-2. The government alerted the defense to these videos that day and noted it would seek to introduce the videos at trial. Dkt. 46 at 2. Although the extraction of the seized phone was made available to the defense by the October 2, 2023 discovery deadline, the defense claimed the videos—of the defendant, from the defendant's own phone—were not timely produced and sought to have them excluded from trial on that basis. Dkt. 47 at 1. In connection with the final pretrial status conference, held four days before jury selection, the defense stated that the defendant would waive his right to a jury trial and not contest factual guilt ***only if*** the Court declined to exclude the defendant's videos from trial. Dkt. 47. The Court rejected the defendant's argument for excluding the videos. Dkt. 51.

In light of the Court's ruling, the defendant sought consent to enter a conditional guilty plea or, alternatively, to proceed by way of a bench trial. Dkt. 51. The government did not consent to a last minute conditional plea but did agree to a bench trial. Dkt. 51. At the November 9, 2023 pretrial status conference, the defendant waived his right to a jury trial and the parties discussed with the Court a tentative plan for proceeding with a bench trial that would also potentially touch upon contested sentencing enhancements. Dkt. 78 at 4:1-21, 5:19-6:21, 7:19-8:17.

On November 16, 2023, the government proposed a bifurcated proceeding to the defense—a bench trial that would be limited to the issue of factual guilt on the charged offense, to be followed by an evidentiary proceeding on sentencing-related enhancements after a verdict was entered.  Dkt. 55 at 2. On that date, the government also informed the defense which Guidelines enhancements it intended to present evidence on at the evidentiary hearing, relying in part on discovery that had already been produced to the defense regarding the defendant's possession and use of firearms.[18]  Dkt. 55; *see also* Dkt. 67 (describing notice given to defense in advance of hearing).  The defense objected to the proposal that an evidentiary hearing be conducted on disputed sentencing issues right after the bench trial, Dkt. 62, but those objections were overruled on numerous grounds, Dkt. 70 at 55:15-56:3.[19]

On December 4, 2023, the Court held a bench trial and found the defendant guilty of the charged

---

[18] In its pretrial conference statement regarding the December 4, 2023 proceedings, the government noted that Special Agent Parker would potentially be testifying about information she learned about the defendant that would bear on the Court's eventual analysis under 18 U.S.C. § 3553(a). Dkt. 55 at 4-5.  This included matters such as the rape, drug trafficking, and other conduct described above.  *See* Relevant Background Part II.B-E, *supra*.  The government elected to not have Special Agent Parker opine on these issues at the evidentiary hearing in light of the defense's objection and contention that it had received inadequate notice as to the specific issues Special Agent Parker might address beyond the disputed Guidelines provisions.  Dkt. 67.

[19] Among other things, the defense claimed that the government would be offering expert testimony at the December 4, 2023 evidentiary hearing and objected on the ground that it had not received expert disclosures regarding that testimony pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G).  Dkt. 62.  But that provision of Rule 16, by its own terms, applies to trial and not a post-conviction evidentiary proceeding related to sentencing like the one that was held.  Fed. R. Crim. P. 16(a)(1)(G)(i) ("At the defendant's request, the government must disclose to the defendant, in writing, the information required by (iii) for any testimony that the government intends to use *at trial* under Federal Rules of Evidence 702, 703, or 705 *during its case-in-chief, or during its rebuttal to counter testimony that the defendant has timely disclosed* under (b)(1)(C)." (emphasis added)); *accord United States v. Worthing*, No. 12-CR-300-CRB, 2018 WL 10322025, at *1 (N.D. Cal. Mar. 2, 2018) ("Rule 16 does not apply where a defendant is not seeking the discovery to aid in the preparation of his defense but is attempting to obtain the discovery for the purpose of gathering material to support various sentencing arguments." (quotation marks omitted)).

As a separate issue, the law also does not require the Court to qualify a witness as an expert—even if the witness is offering an expert opinion—before considering his or her testimony in connection with sentencing.  *See* Fed. R. Evid. 1101(d)(3) (noting that the rules of evidence – except for those on privilege – do not apply in the sentencing context); *see also United States v. Slager*, 912 F.3d 224, 235 n.4 (4th Cir. 2019) (explaining that "[a]pplying *Daubert* would run contrary to the sentencing court's 'wide discretion' to determine the 'sources and types of evidence,' which are relevant for defendants' individualized sentencing." (quoting *Pepper v. United States*, 562 U.S. 476, 488 (2011)); *United States v. Charlesworth*, 5 F. App'x 612, 614 (9th Cir. 2001) ("*Daubert* and *Kumho Tire* are applications of Federal Rule of Evidence 702 and therefore are not controlling at sentencing.").  Indeed, it would be incongruous for *Daubert* to apply at sentencing where a judge, rather than a jury, is the finder of fact and can afford as much (or as little) weight to the evidence as he deems appropriate.  The judicial gatekeeping function called for by *Daubert* would be superfluous in this context.

offense.  Dkt. 63, 64.  After the verdict was announced, the Court held an evidentiary hearing where the government presented evidence from three law enforcement witnesses relevant to the potentially applicable Guidelines enhancements that had been identified for the defense on November 16, 2023.[20] Dkt. 78.  After the hearing, the Court deferred any findings on the disputed Guidelines enhancements, referred the case to Probation, and scheduled sentencing for March 14, 2024.  Dkt. 63.  On February 12, 2024, the sentencing was rescheduled for March 28, 2024 at the request of the parties.  Dkt. 71.

## SENTENCING GUIDELINES CALCULATION

**I.   Legal Background**

### A.   Identifying Relevant Conduct

In calculating the defendant's Offense Level under the Guidelines, the Court must consider relevant conduct as defined in U.S.S.G. § 1B1.3.  As pertinent here, the defendant's relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  U.S.S.G. § 1B1.3(a)(1).  Relevant conduct also includes such conduct where it was "part of the same course of conduct or common scheme or plan as the offense of conviction."[21]  U.S.S.G. § 1B1.3(a)(2).

The "same course of conduct" and "common scheme or plan" are "closely related concepts."  U.S.S.G. § 1B1.3 Appl. Note 5(B).  Offenses are part of a common scheme or plan "if they are substantially connected to each other by at least one common factor," such as a "common purpose" or "similar modus operandi."  U.S.S.G. § 1B1.3 Appl. Note 5(B)(i).  Similarly, offenses are part of the same course of conduct "if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, *or ongoing series of offenses*."  U.S.S.G. § 1B1.3 Appl. Note 5(B)(ii) (emphasis added).  In evaluating whether offenses are part of the same course of

---

[20] The witnesses included South City Police Sgt. Daniel Brown and FBI Special Agent Martha Parker, who had both testified earlier that day at the bench trial, and ATF Special Agent Joseph Centofranchi, who had been noticed by the government as an expert witness on interstate nexus for trial.

[21] This provision applies to "offenses of a character for which §3D1.2(d) would require grouping of multiple counts."  U.S.S.G. § 1B1.3(a)(2).  The offense conduct provision at issue here, § 2K2.1, is such a provision.  U.S.S.G. § 3D1.2(d).

conduct, courts consider "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses."[22]  *Id.*

Where a defendant is convicted of unlawfully possessing a firearm, evidence of his possession of uncharged firearms can be properly considered relevant conduct for purposes of calculating the Offense Level.  *United States v. Parlor*, 2 F.4th 807, 811-812 (9th Cir. 2021).  "These repeated, substantially identical offenses are sufficiently related to be considered part of the same course of conduct (a series of unlawful firearm possessions) or common scheme or plan (to possess firearms unlawfully)."  *Id.* at 812.  In *Parlor*, the Ninth Circuit affirmed the application of a +2 enhancement under U.S.S.G. § 2K2.1(b)(1)(A) where the district court found that the relevant conduct included 3-7 firearms, including three uncharged firearms found in the defendant's residence and storage unit during a post-indictment search.  *Id.* at 810-814.  The Ninth Circuit further affirmed the application of an additional +2 enhancement under U.S.S.G. § 2K2.1(b)(4)(A) where one of the uncharged firearms was determined to be stolen.  *Id.* at 814.

**B.      Use of Electronic Evidence to Establish the Offense Level Under U.S.S.G. § 2K2.1**

For firearms offenses, it is not uncommon for the government to advocate for the application of certain Guidelines enhancements based on electronic evidence—such as photos and videos—where various firearms possessed by a defendant were never recovered.  This Office did just that in *United States v. Dylan Zirpolo*, No. 21-CR-404 (N.D. Cal.), a case where the government argued for the defendant to be held accountable under the Guidelines for multiple firearms based on images that were posted to his Instagram account showing him holding various firearms.  *Zirpolo*, Dkt. 56 at 3-4, 6-9.

Courts regularly rely on such evidence in calculating a defendant's Offense Level with respect to firearms that were not recovered by law enforcement.  In *United States v. Wright*, for example, the Eighth Circuit affirmed the sentencing court's application of a +2 enhancement for 3-7 firearms under U.S.S.G. § 2K2.1(b)(1) based on photos on the defendant's Facebook account showing him with firearms, including one photo depicting the defendant holding one gun with three more at his feet.  993 F.3d 1054, 1060-61, 1067 (8th Cir. 2021).  Numerous other courts have taken the same approach.  *E.g.*,

---

[22] "When one of the above factors is absent, a stronger presence of at least one of the other factors is required."  U.S.S.G. § 1B1.3 Appl. Note 5(B)(ii).

*United States v. Prieto*, 85 F.4th 445, 447-448, 449-450 (7th Cir. 2023) (affirming application of U.S.S.G. § 2K2.1(b)(1)(B) for possession of eight firearms where defendant sold confidential source five firearms and texted him pictures of three additional firearms for sale that were not ultimately sold to the confidential source or seized by law enforcement); *United States v. Fortune*, 2023 WL 6439886, at *2 (2d Cir. Oct. 3, 2023) (affirming application of Guidelines enhancement for possessing at least eight firearms based on images and video from cell phone and testimony from ATF agent explaining why certain firearms depicted in those images/videos appeared to be real); *United States v. Harrison*, 2020 WL 8921413, at *4-5 (6th Cir. Oct. 28, 2020) (affirming application of U.S.S.G. § 2K2.1(b)(1)(C) enhancement for possession of 26 firearms where defendant's phone contained a video of the charged firearm and 25 other guns on a floor with the defendant's voice narrating the video); *United States v. Spencer*, 685 F. App'x 863, 865-867 (11th Cir. 2017) (affirming application of U.S.S.G. § 2K2.1(b)(1)(A) enhancement for possession of 3-7 firearms based on photographs from defendant's cell phone showing him posing with a variety of firearms, notwithstanding fact that only two firearms were seized by law enforcement).

## C.   Standard of Proof

As a general matter, factual findings underlying a Guidelines sentencing enhancement must be proven by a preponderance of the evidence. *United States v. Lonich*, 23 F.4th 881, 910 (9th Cir. 2022). However, prior to the Supreme Court holding in *United States v. Booker*, 54 U.S. 220 (2005), that the Guidelines are advisory, the Ninth Circuit held that where disputed sentencing enhancements would have "an extremely disproportionate impact on the sentence," the government may need to "demonstrate facts underlying those disputed enhancements by clear and convincing evidence."[23] *Lonich*, 23 F.4th at 910 (citing *United States v. Jordan*, 256 F.3d 922, 930 (9th Cir. 2001)). Where that standard applies, the

---

[23] Following *Booker*, no other circuit requires application of a heightened burden of proof to establish facts supporting advisory Guidelines enhancements. *See United States v. Mohammed*, 89 F.4th 158, 164–65 (D.C. Cir. 2023) ("As other circuits have recognized (with the exception of the Ninth Circuit), due process concerns about the burden of proof in extraordinary cases 'were put to rest when *Booker* rendered the Guidelines advisory,' as the reasoning underlying earlier case law," which applied "a more exacting standard than preponderance-of-the-evidence" at sentencing, "is no longer applicable." (internal citation omitted)). And the Ninth Circuit is reexamining its outlier position. *United States v. Lucas*, 70 F.4th 1218, 1221–22 (9th Cir.), *reh'g en banc granted*, *opinion vacated*, 77 F.4th 1275 (9th Cir. 2023). En banc argument in *Lucas* was conducted on January 23, 2024, and suggests that the Ninth Circuit is poised to join its sister circuits.

1    factfinder "must have an abiding conviction that the truth of the factual contentions at issue is highly

2    probable." *Id.* at 916 (quotation marks and brackets omitted).

3            In considering whether the clear-and-convincing standard applies, courts "look to the totality of

4    the circumstances" but generally focus on two factors: (i) whether the increase in the number of offense

5    levels is less than or equal to four, and (ii) whether the length of the enhanced sentence more than

6    doubles the length of the sentence authorized by the initial sentencing guideline range in a case where

7    the defendant would otherwise have received a relatively short sentence.[24] *Id.* at 910-911.  When

8    evaluating these factors, courts consider the cumulative effect of disputed enhancements.  *Id.* at 911.

9    Typically, where one of these factors is present, the other is as well.  *Id.* at 912.  However, where

10   disputed enhancements would increase the offense level by four or more but would *not* more than

11   double the Guidelines range, sentencing courts may apply a preponderance-of-the-evidence standard.

12   *Id.*

13   **II.        The Government's Guidelines Calculation**

14           Based on the evidence presented in this case, the Court should calculate a Total Offense Level of

15   30.[25]  This is the applicable offense level because the evidence demonstrates that (i) the offense involved

16   a semiautomatic firearm capable of accepting a large capacity magazine, resulting in a Base Offense

17   Level of 20 under U.S.S.G. § 2K2.1(a)(4)(B); (ii) the offense involved at least three firearms, resulting

18   in a +2 enhancement under U.S.S.G. § 2K2.1(b)(1)(A); (iii) the offense involved a firearm with an

19   obliterated serial number, resulting in a +4 enhancement under U.S.S.G. § 2K2.1(b)(4)[26]; (iv) the

20   defendant used/possessed a firearm in connection with another felony offense, resulting in a +4

21   enhancement under U.S.S.G. § 2K2.1(b)(6)(B); and (v) the defendant has not clearly demonstrated

22

23

---

24       [24] The Ninth Circuit has identified other factors to be considered but clarified that "the real action
     is in" the two factors noted above, which are the ones that commonly drive the analysis.  *Lonich*, 23

25   F.4th at 911.

26       [25] The government believes clear-and-convincing evidence supports the Base Offense Level and
     enhancement calculations referenced herein.  To the extent the Court believes the evidence meets the

27   preponderance standard, but not the clear-and-convincing standard, and that the heightened standard
     would apply under the disproportionate impact test, and that this would affect its ultimate sentence, it
     may wish to stay sentencing until the Ninth Circuit has issued its en banc decision in *Lucas*.

28       [26] The application of this enhancement is undisputed.

1    acceptance of responsibility, precluding a -2 reduction under U.S.S.G. § 3E1.1.[27]

2        The defendant's Criminal History Category (VI) and properly calculated Total Offense Level of

3    30 yields an advisory Guidelines range of 168 – 210 months imprisonment.

4    **A.    The Offense Involved at Least Three Firearms, Including a Semiautomatic Firearm
            Capable of Accepting a Large Capacity Magazine**

5        The defendant's relevant conduct includes at least three firearms—the Glock pistol that he was

6    convicted of possessing on July 1, 2023 and the two ghost guns depicted in one of the videos located by

7    the FBI on the South City phone—which were part of the same course of conduct or common

8    scheme/plan involving the unlawful possession of firearms.[28]

9        First, there is no reasonable dispute that the defendant himself possessed the two ghost guns.

10   The video of the firearms was located on the defendant's phone and it depicted a hand with unique

11   tattoos matching the defendant's holding one of the ghost guns with the other gun in close proximity on

12   a bedspread found in the defendant's residence.

13       Second, the evidence readily supports the conclusion that these two other guns were real

14   firearms, not replicas or toys.  As ATF Special Agent Joseph Centofranchi testified,[29] the firearms

15   displayed distinct features that were consistent with ghost guns produced by Polymer80, including the

16   trigger guard, pins, and outer shape.  Dkt. 70 at 204:1-208:24.  The ghost gun on the bedspread was also

17   lying next to an extended magazine with a visible brass casing at the top (as Special Agent Centofranchi

18   testified, the brass color is indicative of real ammunition), and the magazine was not consistent with a

19   magazine that could be used for a BB, pellet, or airsoft gun.  *Id.* at 206:13-207:17, 226:14-23.  This

20   evidence should also be evaluated in the context of the defendant's statements and other conduct

---

[27] The government is not advocating for the Court to apply a vulnerable victim enhancement pursuant to U.S.S.G. § 3A1.1(b)(1), though there is an arguable basis to apply this enhancement based on evidence that the defendant specifically targeted AT because of her perceived vulnerability as an independent sex worker.

[28] In fact, recently discovered evidence suggests the defendant's relevant conduct includes a fourth firearm—the gray 9mm ghost gun that the defendant advertised for sale on his Instagram account in 2021.  *See* Relevant Background Part II, *supra*.

[29] Special Agent Centofranchi has been a law enforcement officer for more than a decade, and he has extensive training and knowledge with respect to firearms.  Dkt. 70 at 191:21-193:24.  At ATF, he is an instructor with respect to privately made firearms and has produced machine gun conversion devices. *Id.* at 195:18-25.

discussed above, including (i) his possession of a real firearm on July 1, 2023; (ii) his text messages acknowledging his possession of firearms; (iii) his Instagram post advertising a firearm for sale, which was depicted next to a magazine with a brass casing visible at the top; and (iv) the discovery of two .40-caliber magazines hidden among his belongings at his residence, which could not have been used with the .45-caliber firearm he was convicted of possessing.  The record supports the conclusion that the defendant possessed at least three firearms, not one real firearm and an assortment of toys/replicas.

Finally, the ghost gun that the defendant was holding in his hand in the video in question was equipped with a drum magazine that Special Agent Centofranchi testified was consistent with a drum magazine that would hold at least 25 rounds of ammunition.  *Id.* at 208:25-209:20.  As a result, the ghost gun in the defendant's hand qualifies as a "semiautomatic firearm that is capable of accepting a large capacity magazine."  U.S.S.G. § 2K2.1 Appl. Note 2 (defining such firearms to include a "firearm [that] had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition").  Because the defendant was a prohibited person and possessed a firearm capable of accepting a large capacity magazine, his Base Offense Level is 20 pursuant to U.S.S.G. § 2K2.1(a)(4)(B).[30]

### B.   The Defendant Used/Possessed the Charged Firearm in Connection with Another Felony Offense

The United States agrees with Probation that the defendant is also subject to a four-point enhancement because he used and/or possessed the charged firearm in connection with another felony offense, namely offenses for pimping in violation of California Penal Code 266h(A), pandering in violation of California Penal Code 266i(A), and/or attempted violations of those statutes in violation of California Penal Code 21a.

Under California law, a person commits the felony offense of pimping where he (i) knew that

---

[30] As an alternative, this Base Offense Level would also apply if the defendant's relevant conduct involved a firearm that is described in 26 U.S.C. § 5845(a), such as a machinegun.  As discussed above, one of the videos on the South City phone showed the defendant with a firearm equipped with a toggle switch that is a component of a conversion device used to render an otherwise semi-automatic Glock firearm into a fully automatic machinegun.  Dkt. 70 at 195:18-203:6.  As Special Agent Centofranchi testified, however, the key piece of the conversion device that enables the firearm to operate as a fully automatic firearm is the "leg," which cannot be seen without an up-close inspection.  *Id.* at 197:4-200:4.  Because Special Agent Centofranchi was unable to determine whether this component was present in the firearm depicted in the video on the South City phone, the government is not arguing that the defendant possessed a machinegun for purposes of calculating his Guidelines range.

another person was a prostitute, and (ii) asked for or received payment for soliciting prostitution customers for that person.  Buszin Decl., Ex. 36 at 908 - 911 (Model Jury Instruction 1150).  A person commits the felony offense of pandering where, among other things, he (i) agreed to receive money or something of value in exchange for procuring another person to be a prostitute, and (ii) intended to influence the other person to be a prostitute.  *Id.* at 912 - 913 (Model Jury Instruction 1151).  It is also a felony to attempt to commit either of these offenses, which would require proof that the individual (i) took a direct but ineffective step toward committing the offense, and (ii) intended to commit the offense. *Id.* at 209 (Model Jury Instruction 460).

Here, the record is replete with evidence demonstrating that the defendant used/possessed the charged firearm in connection with his work as a pimp and, in particular, as a specific tool to convince AT to work for him as a commercial sex worker so he could derive income from her.  First, as both Sgt. Brown and Special Agent Parker testified, it is common for pimps to carry firearms in connection with their work (i) as a means of force, fear, or intimidation, and (ii) as a means to protect the sex workers they are managing or themselves.[31]  Dkt. 70 at 70:1-20, 144:21-145:13.  And there is no credible dispute as to whether the defendant was working as a pimp at the time he had the firearm he was convicted of possessing.  *See* Relevant Background Part III.A, *supra*.  Second, the record demonstrates the defendant used the charged firearm to convince AT to come under his management so he could profit from her commercial sex work.  *See* Relevant Background Part I, *supra*.  As described above, in the course of trying to convince AT to work for him, the defendant showed her the charged firearm, told her she would be "protected" working for him, and let her know she would not be working for a "punk."  That conduct served two purposes—it subtly communicated to AT that she should comply with the defendant's wishes because he was armed, and it sought to persuade AT that she would be safer working for a pimp like the defendant.  Indeed, the issue of safety and vulnerability was likely front of mind for AT after the defendant took back the $500 he had paid her earlier that morning and then pressured her to come with him to South City.

---

[31] Sgt. Brown and Special Agent Parker both have significant experience investigating sex trafficking offenses, including those involving firearms.  Dkt. 70 at 69:6-25 (Brown), 126:17-127:20 (Parker).

1    The defense has previously suggested to the Court that AT's statements to law enforcement

2  regarding the defendant and his firearm lack sufficient indicia of reliability and should not be

3  considered.  Dkt. 70 at 237:12-241:6.  That contention lacks merit.  AT's account to law enforcement is

4  supported with substantial corroboration, including (i) text messages between AT and the defendant

5  showing how the defendant contacted her to arrange for a date on the morning of July 1, 2023; (ii)

6  contemporaneous text messages AT sent to family members about the defendant's conduct and

7  possession of a firearm prior to law enforcement being contacted; (iii) registration paperwork from the

8  Comfort Inn showing the defendant booked a room that day for himself and AT[32]; (iv) the fact that AT's

9  description of the defendant's firearm matched the firearm ultimately recovered; and (v) content on the

10 South City phone demonstrating that the defendant was actively pimping various women, recruiting

11 other sex workers to come under his management, and possessing firearms.  *See* Relevant Background

12 Part I, III.A, *supra*.

### C.    The Defendant Is Not Entitled to Credit for Acceptance of Responsibility

14   A defendant is entitled to a two-point offense level reduction where he "clearly demonstrates

15 acceptance of responsibility for his offense."  U.S.S.G. § 3E1.1(a).  It is the defendant's burden to

16 establish that he is entitled to such a reduction.  *United States v. Innie*, 7 F.3d 840, 848 (9th Cir. 1993).

17 The Guidelines identify a number of non-exhaustive factors for courts to consider in evaluating whether

18 the defendant has met his burden.  U.S.S.G. § 3E1.1 Appl. Note 1.  As relevant here, those factors

19 include: (i) truthfully admitting the conduct comprising the offense of conviction, (ii) truthfully

20 admitting or not falsely denying any additional relevant conduct for which the defendant is accountable

21 under §1B1.3, and (iii) the timeliness of the defendant's conduct in manifesting the acceptance of

22 responsibility.  U.S.S.G. § 3E1.1 Appl. Note 1(A), (H).  "A defendant who falsely denies, or frivolously

23 contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with

24 acceptance of responsibility."  U.S.S.G. § 3E1.1 Appl. Note 1(A).

---

26  [32] At the December evidentiary hearing, the defense suggested that AT's statements were unreliable in part because she told police that the defendant had taken back $500 from her yet only $341 was seized when the defendant was arrested.  Dkt. 70 at 240:2-9.  But the cash that the defendant had on him, along with the cash he used to pay for the Comfort Inn room that morning, totaled approximately $548, thus further corroborating AT's account.

Although a defendant who puts the government to its burden of proof at trial usually is not entitled to credit for acceptance of responsibility, there is no per se rule precluding credit for acceptance of responsibility in such a circumstance.  U.S.S.G. § 3E1.1 Appl. Note 2.  "In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial.  This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt."  *Id.*  Where a defendant does go to trial, "a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct."  *Id.*

Here, the defendant cannot carry his burden of establishing clear acceptance of responsibility.  The record shows the defendant vigorously contested his factual guilt and fully intended to pursue an acquittal until four days before trial.  At the first status hearing, the defendant invoked his right to a speedy trial and requested that a discovery cutoff be set for eleven days later, and he thereafter sought to preclude the government from introducing at trial evidence that was either obtained or not specifically identified for the defense after that date, including material from his own seized cell phones.  *See* Relevant Background Part V, *supra*.  When the government identified a video of the charged firearm on the defendant's phone and alerted the defense to this discovery, the defense sought to exclude that evidence from trial and made clear that if the evidence was excluded then the defendant would proceed with a jury trial where factual guilt would be contested.  *Id.*  The defendant decided to waive his right to a jury trial and not contest factual guilt on the charged offense only after the Court ruled that the inculpatory video would not be excluded.  *Id.*  The defendant's decision reflects a last-minute attempt to claim credit for acceptance of responsibility upon realization that the chances of an acquittal were greatly diminished if the video of him with his firearm were not excluded.  This conduct reflects litigation strategy, not genuine acceptance of responsibility.  *United States v. McKinney*, 15 F.3d 849, 853 (9th Cir. 1994) ("The primary goal [of § 3E1.1] is to reward defendants who are genuinely contrite.").

The defendant also cannot carry his burden under § 3E1.1 because he has falsely denied relevant conduct for which he is accountable under the Guidelines.  First, the defendant has continued to falsely deny that he possessed the charged firearm in connection with another felony offense.  *See, e.g.,*

PSR Addendum (Defense Objections).  The defendant's attempt on July 1, 2023 to derive income from AT's commercial sex work occurred at the time he committed the offense of conviction and, indeed, the defendant used the firearm he was convicted of unlawfully possessing in furtherance of that other criminal conduct, thereby rendering it relevant conduct.  *See* U.S.S.G. § 1B1.3(a)(1).  Second, the defendant has continued to falsely deny the number of firearms he possessed, as well as the features of those firearms.  The defendant's possession of those other firearms is also relevant conduct insofar as the firearms were possessed as part of an ongoing course of conduct or common scheme/plan.  *See* U.S.S.G. § 1B1.3(a)(2).

The defendant's false denial of this relevant conduct, standing alone or considered collectively, precludes credit for acceptance of responsibility.  *See, e.g.*, *United States v. Coleman*, 884 F.3d 67, 69-71, 73-74 (1st Cir. 2018) (affirming denial of acceptance of responsibility to defendant who pleaded guilty to drug trafficking charge but falsely denied relevant conduct that he was pimping multiple women); *United States v. Sandidge*, 784 F.3d 1055, 1057-61, 1063-64 (7th Cir. 2015) (affirming denial of acceptance of responsibility to defendant who pleaded guilty to unlawfully possessing firearm but falsely denied that he had pointed the firearm at another person, which constituted another felony offense and resulted in a +4 enhancement under U.S.S.G. § 2K2.1(b)(6)(B)); *see also United States v. Davis*, 875 F.3d 869, 871-872, 875 (8th Cir. 2017) (affirming denial of acceptance of responsibility to defendant who pleaded guilty to wire fraud, use of unauthorized access devices, and aggravated identity theft but then "denied much of the conduct relevant to her convictions" that bore on Guidelines enhancements).

## SENTENCING RECOMMENDATION

### I.   Legal Standard

The Court should impose a sentence sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also* 18 U.S.C. § 3553(a).  The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the advisory Guidelines.  *Carty*,

520 F.3d at 991.  "The guideline range provides not only the starting point for sentencing but the lodestar from which the ultimate sentence must be explained and justified."  *Galloway v. United States*, No. 16-71939, 2016 U.S. App. LEXIS 24280, at *16 (9th Cir. Sep. 16, 2016).

After determining the appropriate advisory Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness considering the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93.  Under Section 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others:

(1)   The nature and circumstances of the offense and the history and characteristics of the defendant;

(2)   The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3)   The need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4)   The need for the sentence imposed to protect the public from further crimes of the defendant; and

(5)   The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

## II.   Judiciary Sentencing Information (JSIN)

For the court's reference, JSIN provides the following data for sentences calculated based on what the government believes is the correct offense level, a Total Offense Level of 30:

> During the last five fiscal years (FY2018-2022), there were 325 defendants whose primary guideline was §2K2.1, with a Final Offense Level of 30 and a Criminal History Category of VI, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 325 defendants (100%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 170 month(s) and the median length of imprisonment imposed was 180 month(s).

## III.   Application of Section 3553(a) Factors

As described above, this case presents a very different record than many other cases involving firearms offenses that are prosecuted in this district.  And a very different sentencing outcome is warranted upon consideration of that record.  Accordingly, the United States recommends that the Court impose a sentence of 156 months' imprisonment and the maximum term of three years of supervised release.

### A.        Nature and Circumstances of the Offense

The nature and circumstances of the offense in this case are extremely serious.  The defendant did not merely possess a firearm at a time when he was prohibited from doing so.  He possessed the charged firearm in furtherance of other criminal activity—namely, pimping and pandering—and he used the firearm to try to convince a vulnerable AT to come under his management as a pimp, even though she had no desire to do so.  The use of his firearm was just one of many tactics the defendant employed to get AT to comply with his wishes, leaving her shaken and traumatized after the fact.  As AT told officers that day, she had heard stories about bad things happening to girls who did not comply with pimps.  While police fortunately were able to intervene and rescue her, AT knew that things could have turned out very differently.

The record also demonstrates that the defendant's possession and use of firearms (his relevant conduct) was not limited to sex trafficking activity.  It should not be lost on the Court that the defendant possessed and was selling controlled substances on July 1, 2023 (among other times) when he was armed with his gun.  Drug trafficking and firearms possession are all too often a volatile mixture that lead to violence and harm to the community.  And even more disturbing is the evidence that the defendant used one of his firearms to gain the compliance of MM when he raped her in May 2022.

Furthermore, the firearm the defendant possessed on July 1 was not his only gun.  The evidence referenced above demonstrates that the defendant possessed multiple firearms as an ongoing course of conduct, including particularly dangerous firearms like the ghost gun equipped with a large capacity magazine and an apparent machinegun he was seen possessing in videos on his phone.  His Instagram account also showed him attempting to sell another firearm.

All of this conduct occurred while the defendant was under federal judicial supervision for his bank fraud conviction.

### B.        History and Characteristics of the Defendant

On July 8, 2021, the defendant stood before the Honorable John Kronstadt in United States District Court in Los Angeles and promised that he was a new man.  Buszin Decl., Ex. 37.  After pleading guilty to defrauding approximately 100 victims out of tens of thousands of dollars, after many years of arrests and convictions for drug dealing, fraud, and identity theft, he claimed to be on a new

1   path.  He thanked the court and said, "Your Honor, I['ve] made a dramatic change."  *Id.* at 12:11.

2          The court ultimately sentenced the defendant to 18 months in custody, a significant variance

3   below the bottom of the Guidelines range, which the court said "was warranted largely by the steps that

4   Mr. Ryan has taken since the conclusion of the serious offense and the changes that have been reflected

5   in his approach to life that are different than those that led him to a Criminal History Category of VI."

6   *Id.* at 17:5-10.

7          However, the defendant's behavior before and after sentencing in that case amply demonstrates

8   that he was just telling the court what he thought it wanted to hear.  The record of his behavior shows

9   that he had not, and still has not, changed.

10          He tried to recruit an underage girl to work for him as a sex worker in San Francisco just days

11   after pleading guilty in his first federal case.  Buszin Decl., Ex. 16.  In the two months following his

12   sentencing, he failed to report for drug testing multiple times, was the subject of a temporary order of

13   protection in Antioch, California, and was selling firearms and narcotics through his Instagram account.

14   *Lamar Ryan I*, Dkt. 137.  His conduct in that period was so concerning that his self-surrender date was

15   moved up.  *Lamar Ryan I*, Dkt. 140.

16          Following his release on November 10, 2021 after a brief two-month period in custody, he

17   returned to his old lifestyle.  The Amended Form 12 issued on July 5, 2023, currently pending before the

18   Court, recounts a litany of violations that began almost immediately after jurisdiction was transferred to

19   this district in March 2022:  that he used cocaine and fentanyl and lied about his drug usage to

20   Probation; that he traveled out of the district on multiple occasions; that he lied about his compliance

21   with multiple pretrial conditions; that he failed to notify Probation about multiple law enforcement

22   encounters; and that he failed to report income/assets while disregarding his restitution obligations.  *See*

23   *United States v. Lamar Ryan*, No. 22-CR-00087 WHO, Dkt. 24.

24          There's more.  On May 31, 2022, he raped a woman at gunpoint in a San Francisco hotel and

25   sought to evade detection by cautioning the victim that he would tell security she was a prostitute who

26   tried to rob him if she said anything.  Buszin Decl., Ex. 19.  A review of the South City phone and other

27   evidence described above shows he has pimped multiple women while on federal supervision, to great

28   personal profit and notwithstanding his claims of indigency to Probation and his failure to pay restitution

1   to the victims he previously harmed.  Dkt. 70 at 139:17-144:14.  The November 2023 search of his

2   apartment and the subsequent investigation revealed that he possessed stolen identity documents for

3   victims who had reported instances of identity theft.  Buszin Decl., Exs. 30, 31, 32, 33, 34.  Videos

4   found on the South City phone and the defendant's social media account showed he possessed multiple

5   firearms at different times.

6        And, with all that going on in the background, the defendant then committed the offense charged

7   in this case on July 1, 2023, almost two years to the day after he was sentenced in his first federal case.

8        During the defendant's prior federal sentencing hearing, he made a statement which at the time

9   seemed in keeping with his supposed new outlook:  "I don't quit when I'm not winning, so now that I

10  feel blessed, it's like I want to keep on doing what I've been doing."  Buszin Decl., Ex. 37 at 9:23-25.

11  In retrospect, it appears that he meant what he said: he intended to, and did, keep on doing what he had

12  been doing.

13       The Court should keep the defendant's history of dishonesty in mind when considering the self-

14  reported information regarding his goals for the future and his desire for rehabilitation.  The record

15  demonstrates that the defendant has always been looking out for one person—himself—above all else.

16  And as an intelligent and experienced participant in the criminal justice system, he is well aware of what

17  to say and do to get the best outcome for himself.  His actions away from judicial and law enforcement

18  scrutiny, however, speak loudest.  And as his prior federal conviction shows, whether his lies eventually

19  catch up with him is merely a problem for a future day.

20  **C.    The Need for the Sentence to Afford Adequate Deterrence, Protect the Public from
            Future Crimes of the Defendant, and Promote Respect for the Law**

21

22       The court must impose a significant sentence to deter the defendant from further criminal

23  conduct, to protect the community from his future crimes, and to promote respect for the law.  These

24  three factors are inextricably intertwined here.

25       The defendant has repeatedly demonstrated that he will not follow the law.  He continues to

26  engage in crimes even while he is under court supervision.  Worse, his crimes are not victimless.  He

27  preys on people, stealing their safety and trust, their money and their identities, even hijacking their

28  livelihoods.  He victimized AT in this case, although he has yet to acknowledge it.

The defendant's complete failure to pay restitution to the victims in his prior federal case while he simultaneously brought in significant income through his many schemes is also notable and demonstrates the defendant's lack of respect for the law, or the victims left in his wake.  He was ordered by the court to pay a total of $74,060 in $100 monthly installments.  Since his sentencing, he has owned or leased an Audi and a Maserati; he traveled to Austin, Cleveland, and Atlanta on multiple occasions; he presumably bought the drugs he lied to Probation about using; and he flashed huge stacks of cash on Instagram.  In that same period, he made one restitution payment, total, of $200.  PSR ¶ 45, n. 5.  The defendant exhibits no remorse or acceptance of responsibility for his crimes, only contempt for the court and for his victims.

The government acknowledges the possibility that no sentence of any length will actually deter the defendant.  Nevertheless, a significant sentence will at a minimum protect the public for some period of time, because the record demonstrates that the only time he is not committing crime is while in custody.

**D.      Need to Avoid Unwarranted Sentencing Disparities**

The government's recommended sentence of 156 months is below the bottom of what the government believes is the properly calculated Sentencing Guidelines range, and below JSIN's national average of 170 months and national median of 180 months.  The recommendation may seem high for a 922(g)(1) case in this district.  However, the record set forth in this memorandum demonstrates that the recommended sentence is not an ***unwarranted*** sentencing disparity, but instead one that is well supported by the significant aggravating considerations described above.

//

//

//

//

//

//

//

//

1

**CONCLUSION**

2        For the reasons stated above and in consideration of all the evidence presented in the record, the

3 United States respectfully requests that the court impose a sentence of 156 months in custody, to be

4 followed by three years of supervised release.

5

6 DATED:  March 21, 2024                                    Respectfully submitted,

7                                                          ISMAIL J. RAMSEY
                                                          United States Attorney
8

9                                                          _____/S/_____

10                                                         JARED S. BUSZIN
                                                          ALEXANDRA SHEPARD
11                                                         Assistant United States Attorneys

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28